Brent O. Hatch (5715)
   bhatch@hjdlaw.com
Mark F. James (5295)
   mjames@hjdlaw.com
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363

Paul J. Dobrowski (*Pro Hac Vice*)
   pjd@doblaw.com
Frederick T. Johnson (*Pro Hac Vice*)
   fjohnson@doblaw.com
Cody W. Stafford (*Pro Hac Vice*)
   cstafford@doblaw.com
DOBROWSKI, LARKIN & JOHNSON L.L.P.
4601 Washington Avenue, Suite 300
Houston, Texas 77007
Telephone: (713) 659-2900

*Attorneys for Plaintiff N8 Medical, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| N8 MEDICAL, INC.,<br>       Plaintiff,<br><br>and<br><br>BRIGHAM YOUNG UNIVERSITY,<br>       Plaintiff-Intervenor,<br><br>and<br><br>N8 PHARMACEUTICALS, INC.,<br>       Plaintiff-Intervenor,<br><br>v.<br><br>COLGATE-PALMOLIVE COMPANY,<br>       Defendant. | **PLAINTIFF N8 MEDICAL, INC.'S AMENDED MOTION TO COMPEL AND OVERRULE DEFENDANT COLGATE-PALMOLIVE COMPANY'S PRIVILEGE ASSERTIONS**<br><br>**(Jury Trial Demanded)**<br><br>Case No. 2:13-cv-01017<br><br>**Judge Bruce S. Jenkins**<br><br><u>**REDACTED-NONCONFIDENTIAL**</u><br><u>**Filed Under Seal on January 7, 2015**</u><br><u>**Docket No. 163**</u> |

I.   **Introduction**

The Court should order Defendant Colgate-Palmolive Company ("Colgate") to produce numerous documents from its amended privilege log for which it asserts the attorney-client privilege.[1]  First, Colgate waived the privilege for many of its documents when it put them "at issue" to the merits of its defense.  Second, Colgate waived the privilege by selectively producing some privileged documents, yet withholding others.  Third, numerous documents withheld on the grounds of attorney-client privilege:  (a) were not created by or for attorneys; (b) do not include attorneys as an author or as a recipient; or (c) do not request or contain legal advice.  Fourth, Colgate transferred ownership to N8 of the patent applications that are the product of the alleged privileged communications.  Thus, it is improperly withholding many non-privileged documents.

In this action, N8 Medical, Inc. ("N8") asserts claims against Colgate for breach of agreements (under New York law) and theft of trade secrets (under Utah and New York law) covering proprietary materials and intellectual property rights related to ceragenins, also known as CSAs.  In sum, Colgate filed patent applications in December 2011 and December 2012 (the "Illicit Patent Applications") in which it wrongfully disclosed—and claimed ownership of—N8's confidential information.  Colgate's wrongful use of N8's proprietary information and materials for its own benefit breached the parties' agreements and constitutes a theft of trade secrets.  As a defense to N8's claims, Colgate argues that the materials and information contained in the Illicit Patent Applications did not come from N8, but rather N8's predecessor, Ceragenix

---

[1] After N8 filed its Motion to Compel, Colgate provided an amended privilege log withdrawing virtually every assertion of the work-product privilege.  Consequently, this Amended Motion to Compel seeks production of documents for which only the attorney-client privilege is claimed.

i

Pharmaceuticals, Inc ("Ceragenix").[2] Colgate then argues that its agreements with Ceragenix and N8 entitled it to file the Illicit Patent Applications as the sole owner of the inventions contained therein; thus, Colgate maintains that there was no breach. Dkt. 78 at p. vi. However, Colgate is unwilling to permit N8 to test this defense. Rather, Colgate attempts to shield the documents that would prove—or disprove—its defense with dubious assertions of privilege.

## II. Factual Background

During the relevant time period, N8 held the exclusive license to certain ceragenins in the fields of mouthwash and toothpaste. Colgate wanted to test ceragenins for potential use in its line of oral care products. Because the ceragenins—and the research, testing, and information surrounding them—are proprietary and confidential, Colgate entered into agreements with Ceragenix and, thereafter, N8 to facilitate their transfer and testing.

Colgate executed two Material Transfer and Evaluation Agreements with N8 (the "N8 MTAs"), and a Mutual Non-Disclosure Agreement. Notably, under the N8 MTAs, Colgate was required to inform N8 of any inventions developed with *any* ceragenins, whether received from N8 or Ceragenix. The N8 MTAs specifically state that the "Material being provided [to Colgate] includes, **but are not necessarily limited to** the following: CSA-44, CSA-13." Ex. A, N8Medical054417 (emphasis added)[3]. The definition of "Materials" in the N8 MTAs covers all "[c]eragenin (cationic steroid antibiotic) compounds, including **any available composition of**

---

[2] In June 2010, Ceragenix filed for bankruptcy. As part of the bankruptcy process, all of Ceragenix's rights relating to ceragenins, including rights to patents, trade secrets, and agreements, were transferred back to Brigham Young University ("BYU"). Subsequently, in September 2010, BYU licensed all of these rights to N8.

[3] Because the relevant terms of the two N8 MTAs are identical, only the 2010 MTA is attached hereto.

**matter** containing or based on derived compounds, and **any available formulations** or chemical modifications thereof." *Id*. (emphasis added). Also, the N8 MTAs provide that N8 succeeded to all rights under the Ceragenix MTA, that all information Colgate had received from Ceragenix was to remain confidential, and that N8 was successor-in-interest to Ceragenix for all information, documents, and agreements. *Id*. at ¶ 9(d). Thus, Colgate expressly agreed that whether it received Materials or information regarding ceragenins from Ceragenix **or** N8, Colgate was expressly prohibited from selling, transferring, disclosing, or otherwise providing access to the Materials or ceragenin information to third parties. Under both the Ceragenix and N8 MTAs, the confidentiality obligations survived for at least seven years after termination. *See* Ex. A, ¶¶ 14-15; *see also* Ex. B, ¶¶ 14-15. Further, under paragraph 7b(4) of the N8 MTAs, Colgate was required to inform N8 of the inventions in the Illicit Patent Applications and pursue a joint filing with N8. Ex. A, ¶ 7(b)(4).

The Illicit Patent Applications specifically identify three different formulae of ceragenins as the basis of their inventions. Ex. C. Those formulae reflect: (a) a "generic" ceragenin; (b) CSA-13, and (c) CSA-8. *Id*. at pp. COLPAL000165-000166. Colgate admits it received only CSA-13 compound from Ceragenix, and received both CSA-13 and 44 compounds from N8. However, Colgate never received the "generic" ceragenin compound or CSA-8 compound from Ceragenix. Consequently, it is imperative that N8 obtain the documents and communications surrounding the Illicit Patent Applications to determine how the inventions were created and when, where, and from whom all ceragenin compounds were received. These documents and communications are essential to N8's ability to test Colgate's primary defense: that "under the Ceragenix MTA, Colgate was entitled to file patent applications on the invention

it alone developed using materials supplied by Ceragenix." Dkt. 78 at p. vi.

In depositions, Colgate's witnesses have relied on this very argument for why Colgate filed the Illicit Patent Applications without giving N8 notice, or including N8 in a joint filing. For instance, Colgate's argument was repeated throughout the deposition of Steven Miller, Colgate's Worldwide Director of Early Research Oral Care during the relevant time period.[4] *See, e.g.*, Ex. D, 89:4 – 90:17; 93:3-19. Colgate initially objected to questions regarding the filing of the Illicit Patent Applications and discussions surrounding the filing, and refused to permit Mr. Miller to discuss conversations he had with Colgate's in-house patent counsel, Nikhil Heble. Ex. D, 152:8 – 153:22. Hours later—near the end of the deposition—Colgate reversed course and permitted N8 to ask very limited questions related to the filing of the Illicit Patent Applications and the notice—or lack thereof—given to N8 of their filing. *Id*. at 316:12 – 317:25.[5] In response, Mr. Miller indicated that the decision not to notify N8 of the Illicit Patent Applications was based on Mr. Heble's interpretation of the MTA. *Id*. at 307:18 – 310:18. But Mr. Miller's internal Colgate emails tell a different story.

As early as June 2011, prior to filing any of the Illicit Patent Applications, Mr. Miller expressly acknowledged that Colgate was obligated to notify N8 of any patent filing, regardless from whom the ceragenins were received. Ex. E at COLPAL018163 – COLPAL018164.

---

[4] Mr. Miller was responsible for Colgate's compliance with the N8 MTAs on a day-to-day basis. Ex. D, 341:10 – 342:21.

[5] Colgate's counsel acknowledged—with little time remaining in the deposition—they would permit N8's counsel to re-ask questions related to discussions between Miller and Heble regarding the notice issue. By that point however, neither counsel could recall the specific questions that Miller had been previously instructed not to answer. Ex. D, 316:12 – 317:25. The parties agreed, however, to resolve the issue of waiver of the privilege "another day," which is the purpose of this motion. *Id*. at 305:14 – 307:7.

Specifically, Mr. Miller wrote:



*Id*. (emphasis added). On October 18, 2011, two months before filing the initial Illicit Patent Application[6], Mr. Miller admitted that Colgate needed to talk with N8[7] about filing joint patent applications on the inventions related to CSA-13. Ex. F at COLPAL017769.

In addition, Dandan Chen, a Senior Research Scientist for Colgate, gave presentations to Colgate employees regarding CSA-13 in October and December 2011. In both presentations, Ms. Chen noted that next steps for Colgate included joint filing with N8 Medical. Ex. G at COLPAL004047; Ex. H at COLPAL004034. Ms. Chen's supervisor, Ms. Larence Du-Thumm testified that she reviewed Ms. Chen's presentations and understood that the references to N8 Medical meant filing joint patent applications with N8. Ex. I, 69:4-25.

So Mr. Miller—and other Colgate employees—were aware of Colgate's contractual obligations to N8. However, Colgate intentionally refrained from notifying N8 of the Illicit Patent Applications because Colgate wanted to use them as "leverage" over N8:



---

[6] The initial Illicit Patent Application is the Patent Cooperation Treaty Application (the "PCT Application") filed on December 21, 2011.

[7] Mr. Miller admitted the word "Ceragenix" was a typo—he meant to reference N8. Ex. D, 150:4-6.

███████████████████████████████████████████

Ex. J at COLPAL019561.  According to Mr. Miller, Colgate wanted leverage so N8 would not execute a license agreement with a Colgate competitor.  Ex. D, 243:12 – 251:2.

On January 18, 2013 Mr. Masters, who had replaced Steve Miller as Director of Colgate's Oral Care Early Research division only six weeks earlier, wrote to his boss Mr. Bill Devizio regarding the N8 ceragenin project and recommended they kill the project.  ███ ██████████████████████████████████ Ex. K.  Mr. Devizio responded by writing, ███  ███████████████ *Id*. (emphasis added).  Thereafter, as testified by Colgate witnesses and documented by internal Colgate emails, Colgate engaged in a strategy to kill the ceragenin project and prevent N8 from utilizing the ceragenin technology with a Colgate competitor.  *See*, *e.g.*, Ex. L at COLPAL013940, and Ex. M at COLPAL015926.  On or about November 1, 2013 Colgate formally terminated its relationship with N8.  However, in February 2014, Colgate admitted that N8 is the rightful owner of the Illicit Patent Applications, the inventions and trade secrets contained therein by assigning ownership of them to N8.  Ex. W.

Despite these facts, Colgate refuses to produce documents that reflect the **factual bases** for its defenses.  Indeed, Colgate's witnesses apparently agreed that it was required to inform N8 of any inventions and jointly file any patent application.  But Colgate refuses to permit N8 to review the very information that its own witnesses reviewed to reach that conclusion.  Without that information, N8 is forced to accept the contradictory and self-serving testimony of Colgate's witnesses and cannot conduct meaningful cross-examination.  Colgate wants its witnesses testify that Colgate did not breach its agreements with N8—or steal trade secrets from N8—but then deny N8 access to documents or communications that could prove otherwise.

I. **Legal Standard**

Typically, privileged documents are exempt from disclosure. *U.S. v. Morton Salt Co.*, 338 U.S. 632, 653, 70 S. Ct. 357, 369 (1950). The party asserting the privilege, however, bears the burden of establishing the essential elements of the privilege. *United States v. Adlman*, 68 F.3d 1495, 1499 (2d Cir. 1995); *U.S. v. Bump*, 605 F.2d 548, 551 (10th Cir. 1979).[8] To invoke the attorney-client privilege, a party must demonstrate that there was: (1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice. *Fisher v. United States*, 425 U.S. 391, 403, 96 S. Ct. 1569, 1577, 48 L.Ed.2d 39 (1976).

II. **Arguments and Authorities**

A. **No Privilege Exists for Numerous Colgate Documents**

It is Colgate's burden to establish that its documents are protected from discovery by a privilege. *See, e.g., Priest v. Hennessy*, 51 N.Y.2d 62, 70, 409 N.E.2d 983, 987 (1980). Colgate's privilege log fails to make even a *prima facie* case that many documents are privileged.

Colgate lists numerous documents on its amended privilege log as protected by the attorney-client privilege, but offers no explanation for why (or how) they are privileged. *See*,

---

[8] Under the N8 MTAs, New York law applies to N8's breach of contract claim; thus, New York privilege law applies to the breach of contract claim. Fed. R. Evid. 501. Utah law applies, however, to N8's theft of trade secrets claim. To the extent privilege issues are raised with respect to invention records or other patent issues, the Federal Circuit's privilege law governs. *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 803 (Fed. Cir. 2000). For purposes of this motion, there does not appear to be any conflict or substantive difference between the privilege law of New York, Utah, or the Federal Circuit (or the Second or Tenth Circuits, for that matter).

Ex. N, documents highlighted in yellow.[9] However, none of these documents involve a communication with an attorney, nor were they made for the purpose of obtaining or providing legal advice. Instead, all of these documents are spreadsheets or charts reflecting Colgate's Invention Records and Illicit Patent Applications involved in this case. *See, e.g.*, Ex. N at pp. 5-8, 22, 26, 30, 32-35, 37-39, 42-47, 50-57, and 66-67, Exs. N-1 – N-4, Ex. O (COLPAL004864), Ex. P (COLPAL004863). While Colgate asserts that these documents were created at the request of Colgate's Patent department, Ms. Du-Thumm testified that such spreadsheets were created to keep Colgate's Chief Technology Officer, Ms. Pat Verduin, notified of her group's annual goals for filing patents. Ex. I, 33:22 – 37:13. Thus, Colgate has refused to produce documents regarding Invention Records and the Illicit Patent Applications created by, and distributed among, non-lawyers for Colgate's ordinary business purposes. Indeed, Colgate implicitly acknowledges that no privilege applies to the attachments because it produced the "cover" email communications to which the spreadsheets were attached. *See, e.g.*, Exhibits Q and R. In essence, Colgate takes the untenable position that N8 can discover the communications between the Colgate non-attorney employees, but cannot discover attachments upon which the emails are based.

**B.   Colgate waived the privilege by putting its communications "at issue."**

A privilege may be waived "either implicitly, by placing privileged matters in controversy, or explicitly, by turning over privileged documents." *Gomez v. Vernon*, 255 F.3d

---

[9] Colgate's amended privilege log is attached as Exhibit N and supplemental logs as Exhibits N1 – N4. All of the documents that N8 challenges are highlighted. The documents highlighted in yellow are spreadsheets/charts for which no attorney is listed as an author or recipient. The documents highlighted in blue are communications in which an attorney is listed as an author/recipient.

1118, 1131 (9th Cir.), *cert. denied*, *Beauclair v. Puente Gomez*, 534 U.S. 1066, 122 S. Ct 667, 151 L.Ed.2d 581 (2001). A privilege may also be waived, for instance, when invoked in some fundamentally unfair way. *Resolution Trust Corp. v. Massachusetts Mut. Life Ins. Co.*, 200 F.R.D. 183, 193 (W.D.N.Y. 2001). Indeed, it is well-established that the attorney-client privilege cannot at once be used as a shield and a sword. *See, e.g., United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991); *see also In re Kidder Peabody Securities Litigation,* 168 F.R.D. 459, 470 (S.D.N.Y. 1996)*; In re von Bulow,* 828 F.2d 94, 103 (2d Cir. 1987); *Clark v. United States,* 289 U.S. 1, 15, 53 S. Ct. 465, 469, 77 L.Ed. 993 (1933) ("The privilege takes flight if the relation is abused."). Simply put, a defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes. *See von Bulow,* 828 F.2d at 101-02. Thus, privileges may implicitly be waived when a defendant asserts a claim that in fairness requires examination of protected communications. *See United States v. Exxon Corp.,* 94 F.R.D. 246, 249 (D.D.C. 1981); *Hearn v. Rhay,* 68 F.R.D. 574, 581 (E.D. Wash. 1975).

Further, waiver may be found even if the privilege holder "does not attempt to make use of a privileged communication; he may waive the privilege if he makes factual assertions the truth of which can only be assessed by examination of the privileged communication." *In re Kidder*, 168 F.R.D. at 470. In other words:

> Under the "at issue" doctrine, where a party places legal advice or other privileged facts or communications at issue, it is deemed to have waived the privilege with respect to such facts or communications and can be compelled to produce them. This doctrine applies where a party, through its affirmative acts, places privileged material at issue and has selectively disclosed the advice.

*American Re-Insurance Co. v. U.S. Fidelity & Guar. Co.*, 40 A.D.3d 486, 492 (N.Y. App. Div.

2007).

Like most courts, Utah courts also recognize that the attorney-client privilege is waived in certain situations. *See* Utah R. Evid. 504(d); *State v. Johnson,* 2008 UT App 5, ¶ 20, 178 P.3d 915; *see also* Utah R. Evid. 507(a) (providing that the privilege may be waived if the holder "voluntarily discloses or consents to the disclosure" of privileged materials). Following other federal and state courts, Utah courts have held that when a party places privileged matters "at issue" in the litigation, that party implicitly consents to disclosure of those matters. *Terry v. Bacon,* 2011 UT App 432, ¶¶ 14-17, 269 P.3d 188, 192-93 (citing cases).

In sum, underlying any determination that a privilege should be forfeited is the notion of unfairness. This notion implicates only "the type of unfairness to the adversary that results in litigation circumstances when a party uses an assertion of fact to influence the decisionmaker while denying its adversary access to privileged material potentially capable of rebutting the assertion." *John Doe Co. v. U.S.,* 350 F.3d 299, 306 (2d Cir. 2003). And "[w]hether fairness requires disclosure has been decided . . . on a case-by-case basis, and depends primarily on the specific context in which the privilege is asserted." *In re Grand Jury Proceedings,* 219 F.3d 175, 183 (2d Cir. 2000). Ultimately, the key to a finding of implied waiver is some showing by the party arguing for a waiver that the opposing party *relies* on the privileged communication as a claim or defense or as an element of a claim or defense. *In re County of Erie*, 546 F.3d 222, 228 (2d Cir. 2008).[10]

---

[10] Some courts have utilized the three part test stated in *Hearn v. Rhay* to determine whether there has been a waiver of the privilege. 68 F.R.D. 574 (E.D. Wash. 1975). More recently, however, courts have criticized the *Hearn* factors and instead relied on the fairness analysis described above. *In re County of Erie*, 546 F.3d at 228 (discussing *Hearn* and collecting authority).

4

Here, Colgate's attempt to use the attorney-client privilege as both a sword and shield should not be permitted. Simply put, Colgate cannot simultaneously argue that it did not breach the parties' contract and did not misappropriate N8's trade secrets, but then shield documents from discovery that would either confirm or undercut its defense.

As discussed above, Mr. Miller, Ms. Chen, and Ms. Du-Thumm provide conflicting testimony and documentary evidence related to whether: (a) ceragenins supplied by N8 were used in the Illicit Patent Applications; (b) Colgate was contractually obligated to notify N8 of the inventions; and (c) the Illicit Patent Applications should have been joint filings with N8. As late as October 2012, ten months *after* the initial Illicit Patent Application was filed, Mr. Miller prepared notice letters to N8 of patent filings, but never sent one. *See* Exs. S, T, U, and V. In his deposition, Mr. Miller testified that he drafted the notice letters because he believed Colgate was obligated to notify N8 of the inventions contained in the Illicit Patent Applications. Ex. D, 214:2 – 224:22. However, on its privilege log, Colgate lists correspondence between Mr. Miller and counsel regarding those notice letters in October 2012. Ex. N at pp. 39-41. Also, Ms. Du-Thumm testified that she participated in a discussion with Mr. Miller and Mr. Heble regarding a patent joint filing and notice to N8. Ex. I, 47:12-22.

As a result, N8 is entitled to test Colgate's defense by reviewing the real-time factual information to determine whether, even under Colgate's interpretation of the agreements, Colgate breached the MTAs and stole trade secrets. Indeed, it is *vital* that N8 be permitted to test the assertions Colgate now seeks to blanket with invalid claims of privilege. Otherwise, N8 is forced to accept Colgate's defense at face value. Thus, the Court should require Colgate to produce documents relating to the inventions contained in the Illicit Patent Applications, how

those inventions were developed, and what ceragenins were used for those inventions.[11]  Colgate should also produce the communications involving its attorneys, including Mr. Heble, regarding these topics and the notice issue.

C.  **Colgate has no privilege because N8 owns the Patent Applications and Patents; Alternatively, Colgate waived the privilege by voluntarily producing the Invention Records.**

On or about February 6, 2014, Colgate transferred ownership of the Illicit Patent Applications, and the concomitant inventions and patents, to N8.  *See* Ex. W.  As part of the transfer process, Colgate voluntarily provided its Invention Records to N8 before the discovery period began.  According to Colgate, the Illicit Patent Applications are based on inventions Colgate developed, which are reflected in the Invention Records.  Dkt. 78, p. 11, ¶¶ 14-16.  Indeed, drafts of the Illicit Patent Applications contain specific references to the Invention Records (and the protocols and data within them).  *See, e.g.*, Ex. X at COLPAL003093.  Consequently, as the ultimate owner of the inventions, Illicit Patent Applications and patents filed by Colgate, N8 cannot be prohibited from understanding the historical make-up of the Illicit Patent Applications.  To do otherwise prevents N8 from exercising all rights and defenses to its property.

In any event, Colgate waived any privilege by voluntarily producing the Invention Records.  Indeed, because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed.  *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 602 (8th Cir. 1977).  Accordingly, it has been widely held that voluntary disclosure of the content of a

---

[11] This should include documents showing any changes to the Illicit Patent Applications, technical additions or details to the Illicit Patent Applications, any requests for additions or changes to the Illicit Patent Applications, drafts of the Illicit Patent Applications, as well as the authors and dates of any of the foregoing.

privileged attorney communication constitutes waiver of the privilege as to all other such communications on the same subject. *See, e.g.*, *Genentech, Inc. v. U.S. Int'l Trade Comm'n*, 122 F.3d 1409, 1416 (Fed. Cir. 1997); *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981); *see also Bump*, 605 F.2d at 551; *In re Horowitz*, 482 F.2d 72, 81 (2d Cir.), cert. denied, 414 U.S. 867, 94 S. Ct. 64, 38 L.Ed.2d 86 (1973); *United States v. Aronoff*, 466 F. Supp. 855, 860-62 (S.D.N.Y. 1979); *In re Grand Jury Subpoena*, 438 F. Supp. 1176, 1177-78 (S.D.N.Y. 1977). In sum, fairness dictates that a privilege holder "cannot be allowed, after disclosing as much as he pleases, to withhold the remainder." *Weil*, 647 F.2d at 24 (quoting VIII J. Wigmore, Evidence § 2291, at 636 (McNaughton rev. 1961)).

To determine the subject matter of a waiver, courts weigh the circumstances of the disclosure, the nature of the legal advice sought, and the prejudice to the parties of permitting or prohibiting further disclosures. *See In re Keeper of the Records XYZ Corp.*, 348 F.3d 16, 23 (1st Cir. 2003) (scope of waiver is fact-intensive inquiry). Typically, invention records are attorney-client communications and thus privileged. *See generally In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800 (Fed. Cir. 2000). As a result, Colgate's voluntary production of its Invention Records is a waiver of any privilege associated with those documents, as well as the subject matter therein.

Moreover, during Mr. Miller's deposition, he was questioned about a spreadsheet related to the Invention Records. Though Colgate refused to produce the spreadsheet, Mr. Miller testified that the spreadsheet tracks Invention Records for their possible conversion into patent filings. Ex. D, 120:12 – 122:24 (discussing Exhibit Q). And Ms. Du-Thumm testified that the spreadsheets were created so that Colgate's Chief Technology Officer could track Colgate's

annual goals for patent filings.  Ex. I, 33:22 – 37:13.  In other words, the spreadsheet apparently contains factual information related to the Invention Records and was used for business—not legal—purposes.  That spreadsheet appears many times on Colgate's privilege log, and should be produced because Colgate waived the privilege with respect to that subject matter.

In addition, Mr. Miller testified about communications related to the Illicit Patent Applications.  For instance, Mr. Miller was questioned regarding a list of potential patent filings, including filings related to CSA-13.  Ex. D, 146:21 – 153:22 (discussing Exhibit F).  That email specifically references discussions related to (1) what inventions to include in the Illicit Patent Applications and (2) whether Colgate had an obligation to notify N8 of the patent filing.  Regardless, Colgate refused to permit Miller to testify to any conversations with Colgate's patent counsel about those very topics.  Ex. D, 152:25 – 153:22.  Additionally, Miller testified regarding emails discussing the Invention Record spreadsheet, as well as patent filings.  Ex. D, 186:9 – 191:22.  Miller testified that Colgate only filed the Illicit Patent Applications based on CSA-13, which is specifically discussed in the email.  Colgate refuses, however, to produce additional documents which would permit N8 to verify Miller's assertion.  Colgate steadfastly maintains that position even though it also produced some drafts of the Illicit Patent Applications.  *See* Exs. X and Y.  But Colgate cannot produce only the documents related to the Invention Records or Illicit Patent Applications when they are helpful, and then claim privilege to the remainder.

Under these circumstances, Colgate should produce all documents and communications related to the subject matter of the Illicit Patent Applications and Invention Records.  The content and subject matter of the Invention Records and Illicit Patent Applications largely mirrors the

information Colgate seeks to use as a sword and a shield with respect to their breach of contract defense. Here, the primary subject matter is the factual underpinnings of the inventions subject of the Invention Records and, ultimately, the Illicit Patent Applications. Not only did Colgate voluntarily waive the privilege as to that general subject matter by providing the Invention Records to N8, Colgate also thrust that information into the heart of its defense. As a result, there is little danger or potential prejudice to Colgate if further disclosures are ordered.

### III.  Conclusion

For the reasons set forth above, N8 requests that the Court grant its motion to compel, overrule Colgate's privilege objections, order Colgate to produce the documents highlighted on Exhibits N and N1 – N4, and permit deposition questioning of relevant witnesses on those topics. In the alternative, N8 requests that the Court review the documents via an *in camera* inspection to the Court.

Respectfully submitted,

**DOBROWSKI, LARKIN & JOHNSON L.L.P.**

By:  /s/ Paul J. Dobrowski
Paul J. Dobrowski
Frederick T. Johnson
Cody W. Stafford

**HATCH, JAMES & DODGE, PC**

Brent O. Hatch
Mark F. James

*Attorneys for N8 Medical, Inc.*

## CERTIFICATE OF CONFERENCE

On December 5 and 8, 2014, counsel for Plaintiff N8 Medical, Inc. sent emails to Colgate's counsel specifically identifying the documents N8 Medical, Inc. seeks to compel and requesting a conference on December 8 or 9, 2014.  Colgate's counsel requested a delay until December 12, 2014 to confer and N8 Medical, Inc.'s counsel agreed.  On December 12, 2014, Colgate's counsel requested an extension to respond, revise Colgate's privilege log and produce the requested documents during the week of December 29, 2014.  N8 Medical, Inc.'s counsel agreed.  However, as of January 4, 2015, Colgate's counsel failed to provide a revised privilege log or produce any of the requested documents.  On January 5, 2015, after Plaintiff filed its Motion to Compel and Overrule Defendant Colgate-Palmolive Company's Privilege Assertions, Colgate produced an amended privilege log.  On January 6, 2015, both counsel agreed to confer regarding the amended privilege log.  On January 7, 2015, both counsel agreed that a further conference would not fruitful at the present time.

/s/ Paul J. Dobrowski
Paul J. Dobrowski

## CERTIFICATE OF SERVICE

      I hereby certify that on the 8th day of January, 2015, a true and correct copy of the foregoing document has been served upon the following counsel of record in accordance with the Federal Rules of Civil Procedure:

Kenneth B. Black
Jill M. Pohlman
David L. Mortensen
**STOEL RIVES (UT)**
201 S. Main Street, Suite 1100
Salt Lake City, UT 84111-4904

Robert S. Clark
Gregory M. Hess
**PARR BROWN GEE & LOVELESS**
185 South State Street, Suite 800
Salt Lake City, UT 84111

Steven C. Smith, Bar No. 04508
Richard R. Thomas (*Admitted Pro Hac Vice*)
Stephen C. Biggs (*Admitted Pro Hac Vice*)
**SMITH LC**
4505 East Chandler Boulevard, Suite 290
Phoenix, Arizona 85048

Michael A. Schern (*Admitted Pro Hac Vice*)
**SCHERN RICHARDSON FINTER
   DECKER, PLC**
1640 South Stapley Drive, Suite 132
Mesa, Arizona 85204

Stephen M. Craig
**Office of the General Counsel
BRIGHAM YOUNG UNIVERSITY**
A-350 ASB
Provo, Utah 84602

Derrick C. Hughes
Steven C. Smith
**SMITH LC**
1800 North Broadway, Suite 200
Santa Ana, California 92706

    */s/ Paul J. Dobrowski*
    Paul J. Dobrowski